NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0022n.06

No. 13-1664

**FILED**
Jan 07, 2015
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

ROBERT BUCHANAN, et al.,

      Plaintiffs-Appellants,

v.

GENERAL MOTORS, LLC,

      Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

BEFORE:    MERRITT, MOORE, and CLAY, Circuit Judges.

**CLAY, Circuit Judge.** This appeal concerns the district court's grant of judgment on the pleadings in favor of Defendant General Motors. Plaintiffs' complaint alleges four claims: (1) equitable estoppel under federal common law and ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3); (2) breach of fiduciary duty under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3); (3) enforcement of substantive rights under ERISA § 502(l)(1)(B), 29 U.S.C. 1132(l)(1)(B); and (4) recovery of benefits (denial of benefits) under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).[1] The district court granted General Motors' motion for judgment on the pleadings as to all claims and dismissed the case. For the reasons that follow, we **AFFIRM**.

---

[1] During the course of the litigation in the court below, Plaintiffs agreed to dismiss Count III.

**BACKGROUND**

**I.      Factual Background**

Plaintiffs are retired autoworkers who were successively employed by General Motors (GM), Bosch, LLC, and Delphi Corporation. Plaintiffs were first employed by GM beginning in the late 1970s or early 1980s. When GM sold its diesel fuel injection business to Bosch in 1988, Plaintiffs began working there and stayed until the plant closed in 2003. When Bosch closed, Plaintiffs transferred to Delphi where they worked until the company declared bankruptcy and shut down its plant in 2006.

In 2006, GM, Delphi, and the United Autoworkers union ("UAW") entered into an agreement titled the "UAW-GM-Delphi Special Attrition Progam" ("SAP").[2] The SAP created a voluntary pre-retirement program under which Delphi employees that had accrued between twenty-seven and thirty years of service would cease reporting to work, but continue to receive monthly wages and accumulate credited service toward their pensions under the Delphi Pension Plan. In exchange, SAP participants would retire when they first accrued thirty years of credited service. Plaintiffs allege that they were offered the SAP "with the expectation and understanding that the pension amount would reflect their respective years of service including those years worked at GM, Bosch, and Delphi."  [R. 27, Second Am. Compl., ¶ 24, PGID 141.] Plaintiffs opted into the SAP and retired when they reached thirty years of service. They contend that for a period of time after retirement they were paid pension benefits pursuant to the SAP, and those payments reflected their total time employed by all three companies.

In 2008, Plaintiffs received two letters from Delphi explaining that there was a dispute between GM, Delphi, and Bosch relating to their pension benefits. Delphi, when it offered the SAP to Plaintiffs, expected each of the three companies to consider Plaintiffs eligible for

---

[2] Plaintiffs were, and continue to be, members of the UAW.

voluntary retirement with thirty years of credited service based on each Plaintiff's employment at all three companies. "Delphi also expected that each company would pay a pro-rata share of [each Plaintiff's] '30 and out' pension based on service accrued at each company." [R. 2, Ex. E, Letters from Delphi, PGID 42.] Bosch, however, considered Plaintiffs to be separated employees who were not eligible for any portion of a "30 and out" pension from Bosch. The letter explained that Plaintiffs would receive a portion of their "30 and out" pension from both Delphi and GM, but that Bosch would likely consider Plaintiffs "eligible for a deferred vested benefit rather than a portion of a '30 and out' pension." [*Id.*] However, the letter assured Plaintiffs that the companies expected to resolve the issue. In the interim, Delphi would provide Plaintiffs with an "administrative accommodation"—Delphi would pay Bosch's share of Plaintiffs' pension benefits so they would continue to receive the same amount of pension benefits. [*Id.* at PGID 43.]

In 2009, GM and Delphi entered into pension asset transfer negotiations whereby Delphi would transfer the assets and liabilities from the Delphi Pension Plan to the GM Pension Plan. On or about the time the official transfer occurred, GM sent a letter to Plaintiffs explaining the transfer and stating that Plaintiffs' pension benefits would be paid entirely from the GM Pension Plan. The letter unequivocally stated that the total gross amount of Plaintiffs' pension benefits would not change.

Despite this assurance, Plaintiffs received letters from GM in 2010 indicating that the amount of their pension benefits would be reduced to reflect the years worked at Delphi and GM but not at Bosch. The letters explained that the assets and liabilities from the Delphi Pension Plan were transferred to the GM Pension Plan, but that the "transfer did not include the additional monies," i.e. the administrative accommodation, "that Delphi was paying" to cover Bosch's

portion of Plaintiffs' benefits. [R. 2, Exhibit F, Letter from GM Regarding Reduction, PGID 47.] The letter concluded, "Since GM does not have any obligation for non-GM hourly-rate employee pension plan credited service, GM cannot provide an additional pension payment on the same basis that Delphi decided to pay the benefit." [*Id.*] GM determined that it would count Plaintiffs' time employed at Bosch toward their eligibility for pension benefits, but it would not count that time in calculating the amount of the benefits due. Thus, it had "revised" Plaintiffs' pension benefits downward. [*Id.*] Plaintiffs allege that this reduction in their pension benefits was done in violation of the SAP.

## II.    Procedural History

Plaintiffs filed this suit against Bosch, Delphi, Fidelity Brokerage Services, LCC, GM, and the UAW bringing four claims: (1) equitable estoppel under federal common law and ERISA; (2) breach of fiduciary duty under ERISA; (3) enforcement of substantive rights under ERISA; (4) and recovery of benefits wrongfully denied under ERISA. As previously mentioned, Plaintiffs voluntarily agreed to dismiss Count III. Plaintiffs also agreed to dismiss Delphi, the UAW, and Fidelity as defendants, and the district court granted the motion to dismiss the claims against Bosch.[3] GM, the last remaining defendant, filed a motion for judgment on the pleadings relating to the three remaining claims. The district court granted the motion in its entirety and this timely appeal followed.

## DISCUSSION

## I.    Plaintiffs' Claims Are Rooted in the SAP

At the outset, we must make clear what this case is about. The gravamen of Plaintiffs' complaint is that "GM made a written representation to all of the named Plaintiffs in the form of the SAP that the pension amount would be calculated using a formula that included their years of

---

[3] The district court's order dismissing the claims against Bosch is not a subject of this appeal.

service at Bosch as well as Delphi and GM." [R. 27, Second Am. Compl., ¶ 29, PGID 142.] Plaintiffs are not making any claim against GM under the GM Pension Plan. They say as much in their brief before this Court: "The district court refused to see the SAP as an ERISA plan and thus found no violation of it. It also conveniently found no violation of the GM Pension Plan of which no violation was alleged in the first place." [Docket No. 29, Appellants' Br., § IV.C.] Plaintiffs' filings before the district court also make clear that they do not allege a violation of the GM Pension Plan.

Plaintiffs appeal the district court's dismissal of Counts I, II, and IV of their Second Amended Complaint. Count I, the equitable estoppel claim, does not allege a violation of the GM Pension Plan. Rather, Plaintiffs claim that "[t]he reduction of the Plaintiffs' pension benefits is in direct violation of the plan[4] terms under the SAP." [R. 27, Second Am. Compl., ¶ 56, PGID 145 (footnote added).] Count II is Plaintiffs' fiduciary duty claim. They allege that GM, as a fiduciary with respect to the Plan, "has and had a duty to discharge its duties with respect to the Plan solely in the interest of the Plan participants and beneficiaries." [*Id.* at ¶ 59, PGID 146.] Again, when Plaintiffs say "Plan," they are referring to the SAP. [*See id.* at ¶ 5, PGID 136.] In Count IV, the denial of benefits claim, Plaintiffs allege, "Defendants reduction in Plaintiffs' pension benefit amounts is in direct violation of the terms of the Plan." [*Id.* at ¶ 69, PGID 148.] Throughout the operative complaint, Plaintiffs allege various ways in which GM violated provisions of the SAP, but they do not once allege that GM violated any provision of its own pension plan.

Similarly, in Plaintiffs' response to GM's motion for judgment on the pleadings, they make clear that all of their allegations arise from GM's actions relating to the SAP. For example,

---

[4] Plaintiffs allege that the SAP "is an employee benefit plan within the meaning of ERISA," and define the term "Plan," as used in their complaint, as the SAP. [R. 27, Second Am. Compl., ¶ 5, PGID 136.]

they argue that GM's "failure of fiduciary duty" is "based on the misrepresentations it made in the SAP." [R. 54, Pls.' Br. in Opp'n to Def. GM's Mot. for J. on the Pleadings, § II.A., PGID 554.] For purposes of their estoppel claim, they allege that GM's liability derives from the SAP, and they spend a full page in which they quote or reference the SAP no less than nine times. At one point, Plaintiffs claim that they "were told by Defendant GM multiple times that by accepting the SAP, their pension benefits would effectively reflect the pro-rata share of their combined time at Bosch, GM, and Delphi." [*Id.* at PGID 560.] Thus, it is clear that Plaintiffs' claims are rooted in the SAP, which they maintain is a free-standing pension plan subject to ERISA. [*See, e.g., id.* at PGID 562 ("The complaint clearly states, 'On or around 2010, when Plaintiffs became aware that their pension benefits were going to be cut severely, the Plaintiffs challenged the reduction of their pensions through the SAP.'").]

## II.    The SAP Is Not an ERISA Plan

The threshold question this appeal then presents is whether the SAP is an ERISA plan. An ERISA employee pension benefits plan is statutorily defined as a:

> plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—
>
> (i) provides retirement income to employees, or
>
> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A). To determine whether a "plan, fund, or program" qualifies as an ERISA employee benefit plan, we look to the surrounding circumstances and ask whether "a reasonable

person [could] ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Hughes v. Zurz*, 298 F. App'x 404, 412 (6th Cir. 2008) (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1372 (11th Cir. 1982)); *see also Int'l Res., Inc. v. New York Life Ins. Co.*, 950 F.2d 294, 297 (6th Cir. 1991) (adopting the *Dilligham* test).

The SAP cannot be classified as an ERISA pension benefits plan in the first instance because it does not provide "retirement income."[5] *See* 29 U.S.C. § 1002(2)(A)(i). It is a self-described "pre-retirement program" that incentivizes retirement by providing certain monthly wages for participating employees with at least twenty-seven but less than thirty years of service. [R. 1, Ex. A, SAP Program Docs., PGID 26.] Employees who elect to participate in the SAP must retire when they first accrue thirty years of service. Upon retirement, the SAP payments end, and the former employee receives pension benefits pursuant to the Delphi or GM Pension Plan. As the district court noted, the SAP does not provide for pension benefits separate from or in addition to those provided by Delphi or GM. Indeed, by its plain terms, the SAP does not provide for pension benefits at all.

The two letters sent by Delphi, upon which Plaintiffs rely, also fail to establish that the SAP is an ERISA plan. The May 21, 2008 letter refers to the SAP as a "pre-retirement program" and does not indicate that the SAP itself provided for any pension benefits. [R. 2, Ex. E, Letters from Delphi, PGID 42.] Instead, the letter explains that Delphi was under the mistaken assumption that each company (Delphi, GM, and Bosch) would base pension eligibility and benefit accrual determinations on each employee's combined credited service from all three companies. The letter also explains that this same faulty assumption led Delphi to believe that each company would pay a pro-rata share of the employee's "30 and out" pension. [*Id.*] Above

---

[5] Plaintiffs do not claim that the SAP qualifies as an ERISA plan under § 1002(2)(A)(ii), i.e., that the SAP resulted in a deferral of income extending until the termination of their employment. *See* 29 U.S.C. § 1002(2)(A)(ii).

all, however, the letter clearly delineates between the monthly wage payments made under the SAP and pension benefits paid upon retirement.

The July 22, 2008 letter similarly acknowledges that "under the 2006 Special Attrition Program," Plaintiffs "entered into a pre-retirement program under which [they] would earn credited service and retire when [they] were first eligible for a '30 and out' pension." [*Id.* at 44.] The letter also informs Plaintiffs that their assets, liabilities, and pension benefit responsibilities relating to their accrued credited service at Bosch and GM are held in the Bosch Pension Plan, and those relating to their accrued credited service at Delphi are held in the Delphi Pension Plan. The July letter makes no mention of pension benefits being due or available under the SAP.

Because the SAP does not provide retirement income, it cannot be classified as an ERISA pension benefits plan. And because the SAP is not an ERISA plan, Plaintiffs' various claims alleging ERISA violations with respect to the SAP must fail.

Ultimately, the pension assets and liabilities pertaining to Plaintiffs' Delphi credited service were transferred to GM, and Plaintiffs were paid their pension benefits pursuant to the GM Pension Plan, without accrual credit for the time employed at Bosch. The GM Plan is indisputably an ERISA plan. However, Plaintiffs explicitly disclaim that GM has violated any provision of its own pension plan. Even a liberal construction of Plaintiffs' complaint—read as alleging a violation of the SAP, which itself functioned as an amendment to the GM Pension Plan—would not save it from dismissal. Contrary to the position taken by the dissent, the SAP cannot be read as a "gloss" on the GM Pension Plan because the SAP explicitly provides that none of its provisions "limit or in any way modify the provisions of any benefit plan or program." [R. 1, Ex. A, SAP Program Docs., PGID 22.]

Although the dissent contends that Plaintiffs are making a claim against the GM Pension Plan, this is plainly not the case. As previously discussed, in Plaintiffs' briefing before this Court, they unequivocally state that they have alleged no violation of the GM Pension Plan. In Plaintiffs briefing before the district court, they alleged that the "SAP outlines a pension benefit," and they sought leave to amend their complaint to raise state law claims in the event the district court found that the SAP did "not qualify as an ERISA plan." [R. 54, Resp. to Mot. for J. on the Pleadings, PGID 14.] It is thus clear that throughout this litigation, Plaintiffs' claims have been rooted in the SAP, not the GM Pension Plan.

This appeal is before us as a result of the district court's dismissal of Plaintiffs' equitable estoppel, breach of fiduciary duty, and denial of benefits claims all brought pursuant to ERISA.[6] However, Plaintiffs have only alleged violations of the SAP. Because we conclude that the SAP is not an ERISA plan, and Plaintiffs have made clear that they do not allege a violation of the GM Pension Plan (the only ERISA plan even potentially at issue), Plaintiffs fail to state a claim under ERISA.

**CONCLUSION**

For the foregoing reasons, we **AFFIRM** the district court's grant of judgment on the pleadings in favor of GM.[7]

---

[6] Plaintiffs brought their equitable estoppel claim under ERISA and federal common law. This Court has never recognized a federal common law estoppel claim separate and outside the bounds of ERISA in the context of a pension plan dispute, and Plaintiffs provide no compelling reason for us to do so now.

[7] We take this opportunity to note that we share the dissent's apparent concern for the hardship that Plaintiffs may be experiencing as a result of being issued significantly lower pension benefits than they previously received or anticipated receiving. If Plaintiffs' complaint and other submissions to this Court and the court below made the allegation that GM violated its own pension plan, then we may have been in accord with the dissent's proffered resolution. However, when reviewing a grant of judgment on the pleadings, we are only permitted to liberally construe the complaint, we cannot rewrite it. *See Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008); *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007).

**MERRITT, Circuit Judge, dissenting.** I disagree with my colleagues' assertion that the "plaintiffs have <u>only</u> alleged violations of the SAP" and not the GM Pension Plan. This position is strange, indeed, because the parties have always known that all of the retirees' pensions would have to come from the GM Pension Plan. There is no other source, and no one ever believed that the SAP alone controlled the funding of the pensions. The case against GM, the only remaining defendant, may not be swept under the rug by simply saying that the Plaintiffs are not making a claim against the GM Pension Plan.

The SAP was a one-time benefit agreement negotiated by GM, Delphi, and the UAW as a result of bad economic conditions in the auto industry and Delphi's bankruptcy. The SAP provided a measure of pre-retirement wages if plaintiffs agreed to retire after 30 years of service. Although Plaintiffs do not claim to receive a pension from the SAP, they claim a pension benefit from GM derived in part from the SAP because the SAP allowed them to retire with "full" benefits, including a pension, once they reached 30 years of combined service, even if they were below retirement age: "Employee will retire without additional incentives when they first accrue 30 years of accredited service under the provisions of the Delphi Hourly-Rate Employees' Pension Plan." SAP at 2.

The complaint in several places refers to the GM Pension Plan and attaches the GM Pension Plan summary as Exhibit H. Paragraph 45 of the complaint in Count I (seeking recovery in equitable estoppel) says that the GM Plan is the source of funds for plaintiffs' pension benefits. Paragraph 69 states that the "reduction in plaintiffs' pension benefits amount to a direct violation of the terms of the Plan," not the SAP. The next paragraph of the complaint then states that these "pension benefit amounts should be immediately reinstated." Moreover, the opinion of the district court notes that the GM Pension Plan is "referenced in multiple exhibits" and is

10

"central to the plaintiffs' claims." Opn. at 5. In addition, at oral argument plaintiffs' counsel answered my questions by saying that the SAP and the Pension Plan should be read together as descriptive of the relevant ERISA plan. GM's lawyer then answered Judge Moore's question along the same lines saying that the SAP should be viewed as a "gloss" on the GM Pension Plan.

Therefore, I do not agree with my colleagues that we can avoid the entire issue of pension entitlement because the retiree plaintiffs are not making any claim against GM under its retirement plan. It is the only place from which their pensions could be paid. There is no doubt that the retirees specifically claimed in their pleadings before the district court and before us on appeal that GM violated ERISA Section 502(a)(3) (providing for equitable estoppel) when GM refused to honor representations to them in a letter of March 20, 2009:

> As a consequence of the Pension Asset Transfer, beginning April 1, 2009, your Delphi pension benefit and your GM pension benefit (if any) will be combined and will be paid in its entirety by the GM plan. The total gross amount of your pension benefit will not change.

The retirees claim that GM reduced their pensions thereafter and that this reduction violated the equitable estoppel provisions of ERISA. We should not try to avoid the fact that the retirees are invoking the GM pension plan and asking for the court to order GM not to reduce their pensions.

The real problem for Plaintiffs is that they did not exhaust their administrative remedies, as they should have, under the GM plan, a fact they conceded before the district court and on appeal. Although ERISA's statutory language does not make exhaustion of administrative remedies a prerequisite to a civil enforcement action, we have long held that "[t]he administrative scheme of ERISA requires a participant to exhaust his or her administrative

remedies prior to commencing suit in federal court." *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991).

In this unusual case—where Plaintiffs allege equitable estoppel, breach of fiduciary duty, and denial of benefits claim with a complex factual background involving a pre-retirement agreement, discord between multiple employers, a bankruptcy and a subsequent transfer of pension obligations from Bosch to Delphi to GM—I conclude that Plaintiffs should have exhausted their administrative remedies under the GM plan before bringing suit. We can only do justice in this case by requiring the exhaustion of these remedies.

In the past, we have recognized "[t]he important public policy of encouraging private rather than judicial resolution of disputes under ERISA…." *Constantino v. TRW, Inc.*, 13 F.3d 969, 974 (6th Cir. 1994). We have also identified eight purposes of administrative exhaustion applicable to ERISA:

(1) To help reduce the number of frivolous law-suits under ERISA.

(2) To promote the consistent treatment of claims for benefits.

(3) To provide a nonadversarial method of claims settlement.

(4) To minimize the costs of claims settlement for all concerned.

(5) To enhance the ability of trustees of benefit plans to expertly and efficiently manage their funds by preventing premature judicial intervention in their decision-making processes.

(6) To enhance the ability of trustees of benefit plans.

(7) To enhance the ability of trustees of benefit plans to interpret plan provisions.

(8) To help assemble a factual record which will assist a court in reviewing the fiduciaries' actions.

*Id.* at 975 (citing *Makar v. Health Care Corp. of the Mid-Atlantic (Carefirst)*, 872 F.2d 80, 83 (4th Cir. 1989); *see also Amato v. Bernard*, 618 F.2d 559, 567-68 (9th Cir. 1980).

These factors require exhaustion here. Simply put, we need a factual record to decide this case, which presents a difficult balancing of equities. It appears Delphi made a mistake in offering this pre-retirement program to Plaintiffs before it discovered Bosch would not consider them eligible for the program's benefits. Based on Delphi's error, Plaintiffs retired early and now receive only about half of the retirement benefit they expected. The issue is who, if anyone, has the obligation to pay Plaintiffs the remaining benefits they expected, or should the loss fall only on the Plaintiffs.

For their part, Plaintiffs ask the court to impose the entire pension bill on GM. But significant factual questions remain unanswered about the extent of Delphi's representations before Plaintiffs retired and GM's obligations under the transfer of Delphi's pension funds to GM. Without an administrative record explaining GM's reason for denying Plaintiffs' benefits and laying out a sequence of communication and promises between the parties, how the case should be decided is unclear. As a result, Plaintiffs must exhaust their administrative remedies before the federal court rules on the motion for judgment on the pleadings—just as the GM Pension Plan requires. We should not try to avoid the entire question by asserting that plaintiffs do not seek any relief against GM. That is not true.